**Norman JETT, Plaintiff-Appellee,**

v.

**DALLAS INDEPENDENT SCHOOL DISTRICT and Frederick Todd, Defendants-Appellants.**

No. 85–1015.

United States Court of Appeals, Fifth Circuit.

Aug. 27, 1986.

David W. Townend, Garland, Tex., for defendants-appellants.

Holl, Heard, Oneal, Gilstrap & Goetz, Frank W. Hill, Shane Goetz, Michael Anthony Rossetti, Frank Gilstrap, Arlington, Tex., for plaintiff-appellee.

Before GEE, RANDALL, and GAR-WOOD, Circuit Judges.

## OPINION

GARWOOD, Circuit Judge:

Appellee Norman Jett brought this suit against appellants, his former employer, the Dallas Independent School District (DISD), and Frederick Todd, his immediate supervisor, under 42 U.S.C. §§ 1981 and 1983, alleging due process, First Amendment, and equal protection violations. The district court entered judgment against the DISD and against Todd in his individual capacity. We reverse the finding that Jett suffered due process violations, holding that Jett was not deprived of a protected property interest. We further hold that the evidence is insufficient to support a finding of constructive discharge. We affirm liability against Todd in his individual capacity based on the racial discrimination and First Amendment claims. However, we reverse and and remand on the issue of the DISD's liability, because the jury did not make sufficient findings to support municipal liability. Furthermore, we reverse and remand as to damages.

### Facts and Proceedings Below

Norman Jett, a white, was the athletic director/head football coach at South Oak Cliff High School in Dallas, Texas until his reassignment to another DISD school in 1983. He was employed by the DISD from 1957 until 1983, and had taught and coached at South Oak Cliff since 1962. Around 1970, the year Jett was promoted to athletic director/head football coach, the racial composition at South Oak Cliff changed from predominantly white to predominantly black.

Frederick Todd, a black, was assigned as principal to South Oak Cliff in 1975. Tensions developed between Jett and Todd concerning several issues, including Jett's attendance record at faculty meetings, equipment purchasing policies, and lesson plan preparation. Several of the problems centered around the November 19, 1982 football game between South Oak Cliff and Plano. Prior to the game, Jett was quoted by a newspaper as saying his team was bigger and better than SMU and the Dallas Cowboys. Todd objected to this statement, believing that it was not true and that it degraded a collegiate team and a professional team. After South Oak Cliff lost the game, Jett entered the officials' locker room in violation of league rules and stated to two black officials that he would never use black officials in another game. Jett had requested black officials for the game despite the Plano coach's position against using black officials. Other controversies erupted over this game, including a reporter's accusations that Jett and other coaches were bribed, players' complaints that the game plan was not followed, and coaches' complaints that nonschool personnel were allowed in the booth. Todd felt that Jett did not show proper leadership in responding to these complaints. In another incident, Jett was quoted in the newspaper as stating that only two South Oak Cliff athletes could meet proposed NCAA academic eligibility requirements. Todd objected to this statement because he believed that far more graduates could meet the proposed requirements.

On March 15, 1983, Todd informed Jett that he intended to recommend that Jett be relieved as athletic director/head football coach. Todd sent a letter dated March 17, 1983 to John Kincaide, white, director of athletics for the DISD, recommending Jett's removal based on poor leadership performance, his inability to plan adequately, and the events surrounding the Plano game.

After meeting with Jett on March 15, Todd made an appointment for Jett to see Kincaide that day. Jett met with Kincaide at the DISD Administration Building. Kincaide suggested to Jett that he return to South Oak Cliff until he received something in writing. Jett then met with John Santillo, director of personnel for the DISD, who suggested to Jett that he should transfer schools because the dam-

age had already been done. At this point, Jett became upset and Santillo suggested that he and Jett meet with Linus Wright, white, Superintendent of the DISD. During this meeting, Jett informed Wright and Santillo that he believed Todd's recommendation was unfounded and that Todd wanted a black coach. Wright suggested that Jett should consider leaving South Oak Cliff, because he and Todd were having difficulties working together. Wright then assured him that the DISD would take care of him and find him another position.

On March 25, 1983, Wright, Santillo, Kincaide, Todd, and two other school officials met to determine whether Jett should remain at South Oak Cliff. Jett was not invited to attend. After the meeting, Wright officially affirmed Todd's recommendation to remove Jett as South Oak Cliff athletic director/head football coach based on irreconcilable conflicts between Jett and Todd. Wright explained at trial that in such circumstances he was compelled to go with the principal.

Soon after the meeting, Santillo notified Jett of his reassignment as a teacher at the Business Magnet School and told him it was the only position available. This assignment, which was effective approximately April 4, 1983, did not include any coaching responsibilities. Although Jett reported to the Business Magnet School, he soon began to miss class because of his emotional distress. After Santillo expressed concern about his poor attendance record, Jett again met with Santillo on May 4, and then with Wright that same day. Wright told Jett that, although no athletic director/head coaching positions were available at the time, Jett would not have to apply for a coaching job and would be considered for any that came open.

On May 5, 1983, Santillo wrote Jett a letter stating that he was being placed on the "unassigned personnel budget," and that he was being assigned to the security department, but that he could not expect to remain in the department for the next school year. The letter also informed Jett that he could pursue any available position and that, if he was not recommended for a staff or quasi-administrative position, he would be assigned a classroom teacher position. Upon receiving the letter, Jett filed this suit.

Around August 4, 1983, Jett received notice that he had been assigned to Jefferson High School as a history teacher/freshman football coach/freshman track coach. Although a head coaching job had previously become available at Madison High School, Jett was not assigned this position, nor did he apply for it. Kincaide decided against assigning Jett to the Madison position because of the pending lawsuit. On August 19, 1983, Jett sent his letter of resignation to the DISD.

Jett's suit was brought against the DISD, Todd in his individual and official capacities, and the DISD Board of Trustees in their official capacities under 42 U.S.C. §§ 1981 and 1983. The jury determined that Jett was deprived of his position as athletic director/head football coach prior to the end of the 1982–1983 school year based on his race and his exercise of protected speech and in violation of his right to procedural due process. In addition, the jury found that Jett was constructively terminated from DISD employment in August 1983. The jury awarded Jett a total of $850,000, including $50,000 punitive damages against Todd. The district court set aside the award of punitive damages, finding "[t]here is absolutely no evidence that Defendant Todd's actions were taken in a malicious, wanton or oppressive manner." It also ordered a remittitur, which plaintiff accepted, with the resulting judgment being against the DISD for $450,000 actual damages, plus $112,870.45 for attorneys' fees, with Todd's being jointly and severally liable for all the attorneys' fees and $50,000 of the damages.

Defendants Todd and the DISD timely filed this appeal.

## Discussion

*Due Process*

Defendants first challenge the finding that Jett suffered a due process violation,

arguing that Jett did not have a property interest in the athletic director/head football coach position at South Oak Cliff. They also contend that Jett was not constructively terminated in August 1983, and thus was not deprived of any property interest he may have had in the remainder (or in renewal) of his contract.[1] We must decide whether Jett had a constitutionally protected property interest by reference to state law. *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The Supreme Court has described the "hallmark of property" as "an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982).

Under Texas law, a school district may adopt the continuing contract scheme provided by Tex.Educ.Code Ann. § 13.101 (Vernon 1972), or it may offer fixed term contracts under section 23.28 of the Education Code. *See Wells v. Hico Independent School District,* 736 F.2d 243, 252 (5th Cir.1984). The DISD has adopted a fixed term contract scheme. Jett was employed under a five-year "teacher contract" that extended until the end of the 1983–1984 school year. He taught classes and was a member of the faculty. The written contract provided that Jett was employed as a teacher "subject to assignment." The contract authorized the superintendent "to assign the teacher to such school as he may determine, and may from time to time assign or reassign the teacher to other schools." Jett was assigned as athletic director/head football coach at South Oak Cliff for the 1982–1983 school year.

Defendants challenge the district court's finding that there was sufficient evidence that Jett had a property interest in his athletic director/head football coach position at South Oak Cliff to authorize submission of the due process issue respecting this position to the jury. The district court instructed the jury that "[a] transfer to a position in which the employee receives less pay or has less responsibility than in the previous assignment or which requires a lesser degree of skill can constitute a deprivation of a property interest." The jury found that Jett possessed a property interest in his employment as head coach and athletic director at South Oak Cliff. In ruling on defendants' motion for judgment n.o.v., the district court found that Jett had a property interest based on Superintendent Wright's concession that there was an oral contract for Jett to serve as head coach and athletic director throughout the 1982–1983 school year (August 9, 1982 through June 2, 1983) and on Jett's supplementary pay of $4,773 for his coaching services during this time. Yet, it is undisputed that Jett received the full supplementary pay throughout the 1982–1983 school year (and would likewise have received it for the 1983–1984 year, under his teaching and coaching assignment at Jefferson High School, had he not resigned).

■ Superintendent Wright testified at trial that Jett held an oral contract with the DISD to serve as a coach for the 1982–1983 school year and that he could not be removed as coach except for good cause.[2]

---

1. Defendants' property interest and constructive discharge contentions were adequately raised in their motions for instructed verdict and for judgment n.o.v., as well as in objections to the charge.

No liberty interest claim was submitted to the jury or found by the district court.

2. Jett's written "Notice of Assignment and Salary" explicitly provides that it is not an employment contract, but "an indication of assignment and salary." It assigns Jett to South Oak Cliff High School as a "Teacher-CTU 195." Wright testified that this designation indicates the ap-

propriate number of hours (classroom teacher units) for a head football coach. However, the notice of assignment does not reflect the supplementary pay for coaching, listing Jett's salary as $27,425. Jett received the supplementary pay of $4,773 for his coaching services pursuant to his oral agreement with the DISD.

In *Grounds v. Tolar Independent School District,* 694 S.W.2d 241 (Tex.App.—Fort Worth, 1985), a Texas court of appeals construing the term contract scheme, Tex.Educ.Code Ann. § 23.28, and the Term Contract Nonrenewal Act, *id.* §§ 21.201–.211, held: "[T]he statutes in-

We have held a public employee's demotion to be a deprivation of a property interest when the employee lost economic benefits that accompanied a position for which he had a legitimate claim of entitlement. *See, e.g., Shawgo v. Spradlin,* 701 F.2d 470, 476 (5th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 345 (1983). Nevertheless, because Jett received the economic benefits that accompanied his coaching assignment, we must assess whether the oral contract created a property interest throughout the school year in the duties and responsibilities entailed in his assignment.[3]

Although "mutually explicit understandings" may create a property interest, *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), we find that Jett's oral contract here did not create a property interest in the intangible, noneconomic benefits of his assignment as coach. Jett's written notice of assignment and his oral contract concerned his assignment as a whole and did not address his specific duties as coach. In *Winkler v. County of DeKalb,* 648 F.2d 411 (5th Cir. 1981), we addressed the due process claim of a public employee who was transferred to a new position at the same salary level, but with greatly reduced responsibilities. We found this transfer to be a deprivation of a property interest, because the DeKalb County Code and the conduct of the parties created a claim of entitlement to certain responsibilities of the employee's prior position. We observed that the County Code "indicates to employees that transfers will be to a position whose duties are of the kind or quality encompassed by their classification. It establishes the reasonable expectation that an employee will not be demoted to a position of vastly diminished responsibilities without cause." *Id.* at 414. However, in *Kelleher v. Flawn,* 761 F.2d 1079 (5th Cir.1985), we rejected a public employee's claim of entitlement to the specific duties that she had prior to the reassignment, commenting that her new duties were "well within the bounds" of duties generally assigned to those in her position. *Id.* at 1087. The employee had asserted an entitlement to teach certain courses, but we found no guarantee, contract, or statute creating an entitlement to teach courses. *Id.* In the present case, we find that neither Jett's written contract nor his oral contract with the DISD gave Jett a property interest in his coaching duties. Therefore, although he may have had a property interest in his coaching salary for the 1982–1983 school year, he did not have such an interest in the continuation of his coaching responsibilities throughout that year.

*Constructive Discharge*

As noted, defendants also contend that there is insufficient evidence to support the jury's finding that Jett was constructively

---

dicate that coaches are hired as teachers and may be assigned to other teaching duties at the discretion of the school district unless the coach's contract specifically limits the duties to which he may be assigned." 694 S.W.2d at 245. However, the Texas Supreme Court reversed the decision on jurisdictional grounds. 707 S.W.2d 889 (Tex.1986).

3. When a public employee has a legitimate entitlement to his employment, the due process clause may protect as "property" no more than the status of being an employee of the governmental employer in question together with the economic fruits that accompany the position. Although the governmental employer may specifically create a property interest in a noneconomic benefit—such as a particular work assignment—a property interest in employment generally does not create due process property protection for such benefits. *See Findeisen v.*

*North East Independent School District,* 749 F.2d 234, 240–41 & n. 3 (5th Cir.1984) (Garwood, J., concurring), *cert. denied,* —— U.S. ——, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985). Of course, a significant loss in responsibilities may result in a deprivation of a liberty interest when the plaintiff has been stigmatized. *See Kelleher v. Flawn,* 761 F.2d 1079, 1087 (5th Cir.1985). Moreover, an employee's loss of noneconomic benefits may support an action for breach of contract. However, not every breach of an employment contract on the part of the government amounts to a deprivation of a property interest. *See Casey v. Depetrillo,* 697 F.2d 22 (1st Cir.1983) (per curiam); *Vail v. Board of Education of Parish Union School District No. 95,* 706 F.2d 1435, 1449 (7th Cir.1983) (Posner, J., dissenting), *aff'd by an equally divided Court,* 466 U.S. 377, 104 S.Ct. 2144, 80 L.Ed.2d 377 (1984).

terminated from his employment in August 1983.[4] In reviewing the district court's denial of defendants' motion for judgment n.o.v., we must consider all of the evidence in the light and with all reasonable inferences most favorable to Jett. *Boeing Company v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). Because the facts and inferences point so strongly in favor of defendants on this issue, we find as a matter of law that Jett was not constructively terminated. *Id.*[5]

▮ A constructive discharge occurs when the employer makes conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign. *Kelleher*, 761 F.2d at 1086; *Junior v. Texaco, Inc.*, 688 F.2d 377, 379 (5th Cir.1982). The determinative factor is not the employer's intentions, but the effect of the conditions on a reasonable employee. *Kelleher*, 761 F.2d at 1086. Jett tendered his resignation on August 19, 1983, stating that, after considering his assignment to Thomas Jefferson High School, he could not accept the position and felt "forced to resign from the public education field with much sorrow and humiliation." Jett argues that his significant loss in coaching responsibilities as well as the racial discrimination and the retaliation for his protected speech that prompted his reassignment amounted to a constructive discharge.

▮ Although a demotion or transfer in some instances may constitute a constructive discharge, we find that Jett's loss of coaching responsibilities was not so intolerable that a reasonable person would have

felt compelled to resign. We have noted that constructive discharge cannot be based upon the employee's subjective preference for one position over another. *Kelleher*, 761 F.2d at 1086. Although Jett's desire to continue coaching may not be equivalent to Kelleher's preference to teach certain courses, *id.* at 1086–87, we believe that Jett's new working conditions simply were not so difficult or so unpleasant that he had no choice but to resign. *See Vaughn v. Pool Offshore Company*, 683 F.2d 922, 926 (5th Cir.1982). Moreover, the humiliation and embarrassment that Jett suffered are not significant enough to support a constructive termination. *See Shawgo*, 701 F.2d at 481–82 (publicity and derogatory comments resulting from disciplinary proceedings were not constructive discharge); *Junior*, 688 F.2d at 380 (unfavorable work evaluations were not constructive discharge).

▮ Furthermore, we believe that the claimed constitutional violations underlying Jett's reassignment cannot alone support a finding of constructive termination. For example, we have held that unlawful discrimination in the form of unequal pay may be relevant to a determination of constructive discharge, but alone cannot constitute such an aggravated situation that a reasonable employee would feel forced to resign. *Pittman v. Hattiesburg Municipal Separate School District*, 644 F.2d 1071, 1077 (5th Cir.1981) (racial discrimination); *Bourque v. Powell Electrical Manufacturing Company*, 617 F.2d 61, 66 (5th Cir.1980) (sex discrimination). Jett has not shown any racial discrimination or free speech violations (or likelihood or threats thereof)

---

4. Jett clearly had a protected property interest in the remaining year of his five-year teaching contract. As we find insufficient evidence of constructive discharge, we pretermit the question of whether constructive discharge can give rise to a due process violation, at least where, as here, there is no finding of intent on the part of the employer to thereby cause the employee's termination or to avoid the procedures that would be required for actual discharge. Constructive discharge is also relevant to the damages claimed for the equal protection and First Amendment violations found respecting the March 1983 decision to relieve Jett of his duties

as head coach and athletic director at South Oak Cliff.

5. We often have noted in the context of bench trials the uncertainty over whether the issue of constructive discharge is a fact-finding subject to the clearly erroneous rule or a mixed question of law and fact. *Kelleher*, 761 F.2d at 1086; *Shawgo*, 701 F.2d at 482 n. 14; *Junior v. Texaco, Inc.*, 688 F.2d 377, 379–80 (5th Cir.1982). The district court here determined constructive discharge to be a question of fact and submitted it to the jury.

subsequent to March 1983 that would constitute intolerable working conditions. Significantly, Jett resigned in August 1983 after receiving his assignment for the 1983–1984 school year, but did not resign in March 1983 after the reassignment that he claims violated his equal protection and free speech rights. We conclude that Jett was not constructively terminated from his employment with the DISD.

### Racial Discrimination/First Amendment

The district court held that there was sufficient evidence to support the jury's finding that Todd's recommendation of Jett's removal as head coach and athletic director was based on Jett's race, and that Jett's exercise of his First Amendment rights was also a substantial motivating factor in Todd's recommendation. The district court thus found Todd liable in his individual capacity. Moreover, it also imposed liability on the DISD based on jury findings of Superintendent Wright's action in approving Todd's recommendation without independent investigation, and on the undisputed fact that Wright had exclusive authority to act for the DISD in such matters.

### 1. *Todd's Liability.*

#### (a) Racial discrimination claims

Defendants argue that Jett did not establish that Todd's recommendation to transfer him was racially motivated. In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the Supreme Court established the usual order of proof and allocation of burdens to be used in cases alleging discriminatory treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This scheme for proving disparate treatment cases applies also to cases brought under sections 1981 and 1983 when these statutes are used as parallel causes of action with Title VII. *Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir.1986); *Chaline v. KCOH, Inc.*, 693

F.2d 477, 479 (5th Cir.1982); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir.1980).

Defendants first contend that Jett failed to establish a *prima facie* case of racial discrimination, suggesting that a white plaintiff may not establish a *prima facie* case by meeting the elements of *Burdine* and *McDonnell Douglas.* However, this scheme of proof applies to white persons in the same manner that it applies to blacks. *McDonald v. Santa Fe Trail Transportation Company*, 427 U.S. 273, 96 S.Ct. 2574, 2582, 49 L.Ed.2d 493 (1976); *Chaline*, 693 F.2d at 479–82. The burden of proving a *prima facie* case is "not onerous." *Burdine*, 101 S.Ct. at 1094. Jett more than met the normal minimum requirements for a *prima facie* case of racial discrimination by presenting evidence from which the jury could find that he, a white, was a member of a racial minority at South Oak Cliff, that he was well, indeed exceptionally well, qualified for the athletic director/head football coach position, and that on the recommendation of his black superior he was replaced by a black who was not more, and was indeed substantially less, qualified. *See Chaline*, 693 F.2d at 480–81.

Once Jett established a *prima facie* case of racial discrimination, the burden shifted to the DISD to articulate legitimate, nondiscriminatory reasons for its actions. The employer's burden is one of production, not persuasion. *Burdine*, 101 S.Ct. at 1095; *see also McDaniel v. Temple Independent School District*, 770 F.2d 1340, 1346 (5th Cir.1985). Defendants met this production burden with, among other things, Todd's March 17, 1983 letter to John Kincaide, recommending Jett's removal based on his poor leadership performance, his failure to prepare lesson plans, and his handling of the Plano game.

Once the employer satisfies this burden of production, the rebuttable presumption of discrimination created by the *prima facie* case disappears. *Burdine*, 101 S.Ct. at 1094–95; *McDaniel*, 770 F.2d at 1346. At this point, the proper inquiry is whether the defendant intentionally discriminated

against the plaintiff. The fact finder is to consider all of the plaintiff's evidence, whether introduced to establish the *prima facie* case or to show that the defendant's proffered reasons are unworthy of belief. *Burdine,* 101 S.Ct. at 1095; *Jones v. Western Geophysical Company,* 761 F.2d 1158, 1161 (5th Cir.1985). The plaintiff may meet this ultimate burden of proof either by showing that the employer's proffered reasons are pretextural or by establishing that the employer's action more likely than not was motivated by a discriminatory reason. *McDaniel,* 770 F.2d at 1346.

■ We do not suggest that presentation of a *prima facie* case necessarily means that the plaintiff can withstand a motion for directed verdict when faced with a defendant's evidence showing nondiscriminatory reasons for the complained of action. *Cf. Sherrod v. Sears, Roebuck & Company,* 785 F.2d 1312 (5th Cir.1986). Rather, the issue is whether, on the record as a whole, there is sufficient evidence from which the fact finder may reasonably conclude that race was a substantial motivating factor in the challenged action. While resolution of that issue indeed presents a very close question here, we are ultimately persuaded that there is sufficient evidence to sustain the verdict against Todd in this respect. We have already noted the evidence establishing Jett's *prima facie* case, which exceeded the normally applicable minimum requirements in that respect. Todd's testimony was the primary evidence tending to support the existence of legitimate nondiscriminatory reasons for the complained of action. In contrast, Wright described Jett as a highly valuable employee, an "outstanding" person who "had made a great contribution to the School District," and DISD Director of Athletics Kincaide testified that he knew of no good reason Jett should have been relieved of his responsibilities as South Oak Cliff athletic director. There was persuasive evidence that Jett was a highly capable and successful coach. Moreover, Todd, prior to 1983, had never given Jett an unsatisfactory rating, and had indeed generally rated him highly. The jury could conclude that

Todd's attempted explanation of these ratings was not satisfactory. Todd's complaint of Jett's not following the "game plan" in the Plano game could be viewed as questionable, given Todd's admission that he knew essentially nothing about football or coaching. Similarly questionable was the complaint regarding insufficient recruitment efforts at South Oak Cliff "feeder" schools given the severe DISD restrictions on such activities. Further, Todd testified that he placed Jett on "probation" in early 1983, and that the word "probation" was on an evaluation report signed by Jett at that time. However, Jett testified that "probation" did not appear on the form when he signed it, and the placement of the word on the page was consistent with its having been added at a later time. By the end of the 1982-1983 school year, all twelve of the South Oak Cliff football coaches were black, and all had been recommended by Todd. Likewise, of the four candidates recommended by Todd for final consideration as Jett's replacement, three were black. There was evidence that many of the tensions between Jett and Todd involved issues of race. The events surrounding the Plano game, including Jett's statements to the black officials, formed a significant part of the basis of Todd's recommendation. In addition, Todd had been critical of Jett for not recruiting black middle school athletes to South Oak Cliff. Furthermore, there was evidence beyond that of Jett's replacement that Todd favored black coaches. We therefore conclude that the jury's finding of racial discrimination was supported by at least minimally sufficient evidence.

### (b) First Amendment claims

■ The jury also determined that Jett's exercise of protected speech was a substantial and motivating factor in Todd's recommendation. Jett may recover for resulting injuries if he was reassigned in retaliation for protected speech even though he does not have a protected property interest in his former position. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S.

274, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977). Whether certain speech addresses a matter of public concern is a question of law "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983) (footnote omitted). An employee's speech generally is not protected when it "cannot be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.; see Gonzalez v. Benavides*, 774 F.2d 1295, 1300–01 (5th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986). Jett was quoted in the newspaper as stating that few South Oak Cliff athletes could meet certain proposed NCAA academic eligibility requirements. This remark, which concerns the academic development of public high school football players and their potential eligibility for playing college football, certainly addresses matters of concern to the community. *See Connick*, 103 S.Ct. at 1690; *Thomas v. Harris County*, 784 F.2d 648, 653 (5th Cir. 1986); *Davis v. West Community Hospital*, 755 F.2d 455, 461–62 (5th Cir.1985).[6]

■ Defendants claim that because the statements were not true they cannot be protected. However, the First Amendment generally protects false statements unless they were made knowingly or with a reckless disregard for the truth. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811 (1968); *Gates v. City of Dallas*, 729 F.2d 343, 346 (5th Cir.1984). There was no evidence that Jett knowingly made false statements or spoke with a reckless disregard for the truth in discussing the eligibility of his athletes under proposed NCAA standards. Moreover, the statements were not made as a part of Jett's performance of his official duties or as a part of DISD business.

Todd conceded in his trial testimony that Jett's published remarks were a "substantial motivating factor" in his decision to recommend Jett's removal. *See Mt. Healthy City*, 97 S.Ct. at 576. Thus, the burden of proof was shifted to defendants to show that Todd's reassignment recommendation would have been made in the absence of the protected speech. *Id.; Kelleher*, 761 F.2d at 1083. The evidence at least minimally supports the jury's finding that the recommendation would not have occurred in the absence of this public statement.

■ Finally, defendants contend that Todd cannot be held individually liable on the racial discrimination or First Amendment claims because he did not have the authority to reassign Jett and because he acted in good faith. First, Jett must establish an affirmative causal link between Todd's action and any injury Jett sustained from the civil rights violations. *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir.), *cert. denied,* 464 U.S. 897, 104 S.Ct. 248, 78 L.Ed.2d 236 (1983). Even though Todd lacked the final authority to reassign Jett, the jury found, on adequate evidence, that Wright's reassignment decision was based on Todd's recommendation and that Jett suffered damages proximately caused by Todd's challenged action. The form of the charge in this respect is not complained of as to Todd. We reject Todd's contention that the judgment as to him must be reversed because, as is concededly the case, he had only recommending authority. Second, Todd is not protected by the qualified good faith immunity, because he violated Jett's constitutional rights and those rights were clearly established at the time of the recommendation. *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 3021, 82 L.Ed.2d 139 (1984).[7]

---

6. *Connick* also requires a balancing between the employee's freedom of expression and the school's interest in "the effective and efficient fulfillment of its responsibilities to the public." 103 S.Ct. at 1692; *see Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). However, defendants do not argue here that the DISD's concerns of efficient administration outweighed Jett's interest in expression.

7. We also note that the jury rejected Todd's good faith defense.

2. *DISD's Liability.*

(a) Section 1983

 We now turn to the DISD's claim that there was insufficient evidence to support a finding of municipal liability under 42 U.S.C. § 1983. The DISD cannot be held liable under section 1983 based on *respondeat superior,* however, liability may be imposed if the constitutional violation is due to official action, policy, or custom. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). In *Bennett v. City of Slidell,* 735 F.2d 861 (5th Cir.1984) (en banc) (per curiam) (modifying 728 F.2d 762 (en banc)), *cert. denied,* — U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985), we defined "official policy" as:

"1. A policy statement, ordinance, regulation, or *decision that is officially adopted* and promulgated by the municipality's lawmaking officers or *by an official to whom the lawmakers have delegated policy-making authority;* or

"2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority."

*Id.* at 862 (emphasis added).

The district court's instruction to the jury concerning municipal liability, to which the DISD objected, was deficient in light of *Bennett,* because it did not state that the city could be bound by the principal or superintendent only if he was delegated policymaking authority (or if he participated in a well settled custom that fairly represented official policy and actual or constructive knowledge of the custom was

attributable to the governing body or an official delegated policymaking authority).[8] *See Webster v. City of Houston,* 735 F.2d 838, 840–42 (5th Cir.) (en banc) (per curiam), *rev'd on other grounds,* 739 F.2d 993 (5th Cir.1984) (en banc). Yet, the district court found the *Bennett* test satisfied as a matter of law. The court based this conclusion on its determination that the DISD Board had delegated "sole and unreviewable authority to the superintendent to 'reassign' members of the coaching staff," and that Jett was reassigned in the customary manner.

The evidence is indeed undisputed that although the DISD Board alone had and retained authority to terminate teachers, including coaches, nevertheless Superintendent Wright had the sole and unreviewable authority to reassign teachers, including members of the coaching staff. In *Neubauer v. City of McAllen, Texas,* 766 F.2d 1567 (5th Cir.1985), we found that a termination decision made by the city manager, who possessed exclusive authority in such decisions, constituted policymaking power sufficient to hold the city liable under section 1983. *Id.* at 1573–74. We observed that the city manager acted "in lieu of the governing body" in deciding whether to fire employees. *Id.* at 1574 (quoting *Bennett,* 728 F.2d at 769). The Supreme Court recently has reaffirmed that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati,* — U.S. ——, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986). Of course, not every decision by a municipal policymaker subjects the municipality to section 1983 liability: "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* 106 S.Ct. at 1299 (footnote omitted). Moreover, that a policymaking official has discretion in the exercise of a

---

8. The district court instructed the jury:

"A public independent school district (such as and including the Dallas Independent School District) is liable for the actions of its Board of Trustees and/or its delegated administrative officials (including the Superintendent and school principals), with regard to wrongful or unconstitutional action taken against or concerning school district personnel."

particular function does not give rise to municipal liability for the official's exercise of such disrection unless the official also is responsible for final municipal policy respecting the function. *Id.* at 1299–1300. In this connection, *Pembaur* also seems to indicate that the mere fact that an official has discretionary, and inferentially final, authority to make particular concrete decisions in a given area does not necessarily mean that the official is a policymaker with respect to that area or those decisions. *See* 106 S.Ct. at 1300 n. 12.[9] If the latter statement is a correct reading of *Pembaur*, then Wright's final exclusive authority to make discrete individual transfer decisions would not alone subject the DISD to responsibility for his actions in the case of a particular individual transfer decision *unless* he *also* had final authority with respect to general DISD transfer *policy* applicable to teachers or coaches. We need not, however, decide whether this reading of *Pembaur* is correct or whether Wright was shown to be the DISD official responsible for establishing DISD employee transfer policy. Even if the record established as a matter of law that Wright had the requisite policymaking authority, the district court's instructions were nevertheless insufficient.

The district court instructed the jury that, if it found that Todd's recommendation was based upon consideration of plaintiff's race and would not have been made in the absence of this consideration, the DISD "may be liable for violating plaintiff's constitutional rights if the decision to remove plaintiff was made solely on the basis of defendant Todd's recommendation without any independent investigation." The court also gave the same instruction concerning the DISD's liability conditioned on a finding that Jett's exercise of First Amendment rights was a substantial motivating factor in Todd's recommendation and that his recommendation would not have been made in the absence of the exercise of these rights.[10]

■ The jury's finding that Wright made the decision based solely on Todd's recommendation without further investigation is not sufficient to support the imposition of municipal liability. The jury made no finding that Wright's decision was in fact improperly motivated or that Wright knew or believed that (or was consciously indifferent to whether) Todd's recommendation was so motivated. *See Neubauer*, 766 F.2d at 1578–80.

We have stated that the First Amendment does not protect a government employee "from the possibility that his employment might be terminated—however mistaken or *unreasonable* that decision might be—so long as his employer is not *motivated* by the desire or intention to curtail or retaliate for employee activity which the Constitution protects." *Neubauer*, 766 F.2d at 1578 (emphasis in original); *see Connick*, 103 S.Ct. at 1690. If

---

9. Footnote 12 of *Pembaur* states:

"Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis of county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability." (Emphasis in original.)

*See also Rhode v. Denson*, 776 F.2d 107, 109–10 (5th Cir.1985), *cert. denied*, — U.S. —, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

10. The DISD objected to the charge concerning its liability on the basis that it was contrary to *Monell*, did not require a finding of custom or policy, and imposed liability on a *respondeat superior* basis. It also objected on the basis that the instruction would impose liability on the DISD without any finding of fault, or even negligence, on its part and amounted to imposing a "form of strict liability" on the DISD.

the DISD is to be liable because of Wright's actions, then those actions must *themselves* have been wrongful, otherwise the DISD is necessarily being held liable for Todd's actions, and Todd clearly was *not* a policymaker under *Pembaur.* For Wright's actions to have been wrongful, they must either have been based on Jett's race or Jett's exercise of his First Amendment rights. That Wright may have acted solely on the basis of Todd's recommendation does not establish either fact, at least where, as here, it was neither found nor established as a matter of law that Wright knew or believed that (or, perhaps, was consciously indifferent to whether) Todd's recommendation was so based. Of the *many* facially legitimate matters mentioned in Todd's recommendation letter to Kincaide, only one arguably pertains to either race or freedom of expression, namely, that after the Plano game Jett went into the officials' room, which was contrary to school district policy, and said, "I will never use a Black official again." Wright testified that this played no part in his decision. He also testified that Jett's having made public statements in the media played no part in his decision, and that he was unaware that Todd based his recommendation on remarks made by Jett to the media. Wright further stated that Jett's race played no part or role in his decision. Todd testified that race played no part in his recommendation, and that the referenced Plano game incident was considered by him not on a racial basis, but because Jett violated school district policy by going into the officials' room and because the race of the officials should not be considered in evaluating their performance. Taken at face value, this does not demonstrate that Todd's actions violated Jett's equal protection or First Amendment rights. While Wright stated that Jett had told him he thought that Todd's recommendation was made because Todd wanted a black coach,[11]

there is no indication whatever that Wright credited this, nor does the evidence conclusively establish that he should have. Wright testified that he discussed several of Todd's facially legitimate complaints with Jett, and informed him that in a case of a conflict between a coach and his principal, Wright would have to side with the principal, "unless he is in error himself and I hadn't found where Dr. Todd was in error." Wright had ordered an investigation, but was unaware that it was not actually carried out. It was not established as a matter of law that Wright acted other than in complete good faith or with knowledge or belief that (or conscious indifference to whether) Todd's recommendation was based in any way on Jett's race or exercise of his First Amendment rights.

We thus conclude that the jury findings are insufficient to support the imposition of liability against the DISD under section 1983.

### (b) Section 1981

Defendants also challenge the district court's conclusion that liability may be imposed against the DISD solely on the basis of *respondeat superior* under 42 U.S.C. § 1981. The district court relied upon our decision in *Garner v. Giarrusso,* 571 F.2d 1330 (5th Cir.1978), in which we found that section 1981 did not provide immunity like that available to the municipality under the *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), interpretation of section 1983.[12] 571 F.2d at 1338–41. *See also Mahone v. Waddle,* 564 F.2d 1018, 1031 (3d Cir.1977), *cert. denied,* 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978). Of course, *Garner* was decided before the Supreme Court determined in *Monell* that a municipality may be liable under section 1983, although *not* on the basis of *respondeat superior.* We therefore must decide whether *respondeat superior* may support

11. Jett himself testified that it was not until sometime after his removal as head coach and athletic director had been accomplished that he concluded that race had played a part in Todd's recommendation, and until then he believed it had not.

12. *Garner* did not address whether the municipal liability could be imposed on the basis of *respondeat superior.*

municipal liability under section 1981 in light of *Monell* and its progeny.

In *Monell*, the Supreme Court carefully examined the legislative history of section 1983 and concluded that Congress did intend municipalities to be included among those persons to whom the statute applies, 98 S.Ct. at 2035, but that Congress did *not* intend for a municipality to be held liable unless action pursuant to official municipal policy caused a constitutional tort. *Id.* at 2036. The Court discussed Congress' rejection of the Sherman Amendment, which was viewed by its proponents "as a form of vicarious liability for the unlawful acts of the citizens of the locality." *Id.* at 2036 n. 57. The Court concluded that "when Congress' rejection of the only form of vicarious liability presented to it is combined with the absence of any language in § 1983 which can be easily construed to create *respondeat superior* liability, the inference that Congress did not intend to impose such liability is quite strong." *Id.* The Court also considered the language of the statute, which appears to require that a municipality found liable have caused the constitutional violation or have caused its employee to violate another's constitutional rights. *Id.* at 2036. Thus, the Court concluded in *Monell,* and has recently reaffirmed, that a municipality may be held liable only for its own constitutional violations. *Pembaur,* 106 S.Ct. at 1297–98, *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 2433–34, 85 L.Ed.2d 791 (1985).

■■■■■ We believe that to impose municipal liability on a *respondeat superior* theory under section 1981 would be inconsistent with the Supreme Court's reasoning in *Monell* and *Pembaur.* Unlike section 1983, which only provides a remedy for violations of rights secured by federal stat-

utory and constitutional law, *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980); *Irby v. Sullivan,* 737 F.2d 1418, 1427 (5th Cir.1984), section 1981 provides a cause of action for public or private discrimination based on race or alienage. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *see generally* B. Schlei & P. Grossman, *Employment Discrimination Law* 668–77 (2d ed. 1983). Thus, section 1981 is broader than section 1983 in that it reaches private conduct, but narrower in that it only provides a remedy for discrimination based on race or alienage. B. Schlei & P. Grossman, *supra* at 675–76. Therefore, to permit municipal liability based on *respondeat superior* under section 1981 would impose liability on a city for only a few types of constitutional violations which might be committed by its employees. We believe that the Supreme Court's focus in *Monell* in this connection was not on particular types of "federal" wrongs, but rather was on a particular type of liability for all such wrongs. The Supreme Court's interpretation of section 1983 and its legislative history indicates that Congress did not intend to impose different types of liability on a municipality based on the particular "federal" wrong asserted. The *Monell* Court concluded that in 1871 when Congress enacted what is now codified as section 1983, which was five years after it had enacted the statute that became section 1981, Congress did not intend municipalities to be held liable for constitutional torts committed by its employees in the absence of official municipal policy. To impose such vicarious liability for only certain wrongs based on section 1981 apparently would contravene the congressional intent behind section 1983.[13]

---

13. We note that approximately a century later Congress did impose vicarious liability on an employer for its employee's unlawful discrimination when it enacted Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Thus, a municipality may be found liable based on *respondeat superior* under Title VII. *See, e.g., Hamilton,* 791 F.2d at 444. Analogously, neither section 1983, *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 1146–47, 59 L.Ed.2d 358 (1979), nor section 1981, *Sessions v. Rusk State Hospital,* 648 F.2d 1066, 1069 (5th Cir.1981), overrides the Eleventh Amendment, but Title VII does. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

Plaintiff relies on several cases applying a *respondeat superior* theory under section 1981 in the context of private employment. *See, e.g., EEOC v. Gaddis,* 733 F.2d 1373 (10th Cir.1984); *Miller v. Bank of America,* 600 F.2d 211 (9th Cir.1979). Our reasoning, of course, does not prevent the imposition of vicarious liability on a private employer under section 1981. Other courts have held that a city may be liable for racially motivated acts of its employees on a *respondeat superior* theory under section 1981. *See Haugabrook v. City of Chicago,* 545 F.Supp. 276, 279–81 (N.D.Ill.1982) (citing cases). In *Haugabrook,* on which plaintiff relies, the court looked to the differences between sections 1983 and 1981, and concluded that the *Monell* reasoning does not bear on section 1981. *Id.* The court stated that "there is no principled reason to distinguish between private and public employers based upon the wording or history and purpose of section 1981...." *Id.* at 281. We believe that the Supreme Court's interpretation in *Monell* of Congress' intent in enacting section 1983 provides compelling reasons for distinguishing between private and municipal liability under section 1981. Moreover, in past decisions we have, albeit without discussion, denied municipal liability asserted on a theory of *respondeat superior* under section 1981. *See Hamilton,* 791 F.2d at 444–45 (city held liable "only under Title VII" although sections 1981 and 1983 raised); *Irby,* 737 F.2d at 1423–25 (same).[14]

*Damages*

We have reversed all liability findings as to the DISD, but have sustained liability as to Todd for the claimed equal protection and First Amendment violations. However, we have held that there was no evidence to warrant the submittal of the claimed due process violation nor of the claim of constructive discharge. A significant part of the damages were sought on the basis of the theory that Jett had been deprived of employment with the DISD.[15] Accordingly, a retrial is also required as to damages, both for Todd and the DISD. *Cf. Memphis Community, School District v. Stachura,* — U.S. ——, ——, 106 S.Ct. 2537, 2544, 91 L.Ed.2d 249 (1986).

## Conclusion

We determine that Jett has no claim against either Todd or the DISD for due process violation or constructive discharge, and we reverse the district court's contrary determinations. These claims are ordered dismissed. We sustain the findings of liability against Todd for equal protection and First Amendment violations, but reverse and remand the damages awarded against Todd on these counts for a new trial. We reverse the findings of liability and damages against the DISD on the equal protection and First Amendment claims and remand these claims and damages for another trial. The award of attorneys' fees is set aside and remanded for reassessment following retrial, both as to the DISD and Todd.[16]

14. We also note that in other respects relief is available under Title VII for constitutional violations where it is not under sections 1981 and 1983. *See University of Tennessee v. Elliott,* — U.S. ——, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) (applying collateral estoppel to state administrative fact-findings for purposes of sections 1981 and 1983 but not for purposes of Title VII).

15. In acting on the request for remittur, the district court assumed that the evidence supported $294,000 of economic damages, a figure which was clearly based on the hypothesis that Jett had been constructively discharged. While the jury's verdict as to the DISD was segregated into pre- and post-August 20, 1983 damages, it was not so segregated as to Todd. Further, the remittur was not expressly segregated between pre- and post-August 20, 1983 damages. In light of the very sizable verdict, the district court's remittur, and our other action on this appeal, we conclude that the interests of justice require that the entire verdict on damages be set aside also.

16. Defendants have made various complaints as to the district court's computation of attorney's fees. We do not pass on the merits of defendants' challenges, for the district court must recompute the attorneys' fees as to Todd following any retrial as to damages with respect to him and on the basis that Jett has no due process or constructive discharge claim. As to the DISD, should Jett prevail on retrial, attorneys' fees will also have to be recomputed.

Jett has not challenged the district court's grant of judgment n.o.v. on his claim against

Accordingly, the cause is remanded for further proceedings consistent herewith.

REVERSED and REMANDED.

Todd for exemplary damages, and that ruling remains in effect.