2006 OK CIV APP 122

FRATERNAL ORDER OF POLICE, LODGE 142 and Tom Hankins, Plaintiffs/Appellants,

v.

CITY OF PERKINS, Oklahoma, Defendant/Appellee.

No. 102,113.

Court of Civil Appeals of Oklahoma, Division 3.

June 23, 2006.

Certiorari Denied Oct. 3, 2006.

Douglas D. Vernier, James R. Moore & Associates, P.C., Oklahoma City, OK, for Plaintiffs/Appellants.

Tony G. Puckett, Ronald T. Shinn, Jr., McAFee & Taft, A Professional Corporation, Oklahoma City, OK, for Defendant/Appellee.

BAY MITCHELL, Presiding Judge.

¶ 1 Plaintiffs/Appellants the Fraternal Order of Police, Lodge 142 (Police Lodge) and Tom Hankins appeal from an order of the district court granting summary judgment to Defendant/Appellee City of Perkins. City terminated Hankins as a police officer because he could not fulfill his duties after he was banned from using the dispatching and

jail facilities of the Iowa Tribe with which City contracted for services. The Police Lodge and Hankins filed a grievance under the collective bargaining agreement (CBA) that required binding arbitration. The arbitrator found City did not have just cause to terminate Hankins, and ordered City to reinstate Hankins and make him whole of all wages and benefits of employment. City refused to comply with the arbitrator's award.

¶2 The Police Lodge and Hankins filed an action to enforce the arbitrator's award in district court, and City filed a counterclaim asking the court to vacate the award. The Police Lodge and Hankins moved for partial summary judgment for enforcement, and the City counter-moved for summary judgment to vacate the award. The court awarded summary judgment to the City. The court found the arbitrator's decision did not draw its essence from the CBA because he imposed requirements not required by the CBA, and the award was based on considerations of fairness and equity instead of the terms of the CBA.[1]

¶3 Oklahoma law requires binding and final arbitration of labor disputes for police departments. 11 O.S.2001 § 51–111. The purpose of arbitration is to prevent court intervention into the merits of disputes when arbitration has been provided for contractually. *Voss v. City of Oklahoma City*, 1980 OK 148, ¶5, 618 P.2d 925, 927. An arbitrator's power is both derived from, and limited by, the collective bargaining agreement. *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 744, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641, 655 (1981).

¶4 In reviewing an arbitrator's decision, the district court must afford the arbitrator great deference, and cannot review the merits of the award, including any of the factual or legal findings. *City of Yukon v. International Ass'n of Firefighters, Local 2055*, 1990 OK 48, ¶8, 792 P.2d 1176, 1179. Because the parties bargain for the arbitrator's construction of the contract, a reviewing

court cannot overturn that decision merely because it disagrees with the arbitrator's interpretation of the contract. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). An arbitration award is only legitimate if it "draws its essence from the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). If the arbitrator's words manifest an infidelity to this duty, the reviewing court has no choice but to refuse to enforce the award. *Id.* The Sixth Circuit has stated an arbitrator's award does not draw its essence from the CBA when it:

1. conflicts with express terms of the collective bargaining agreement;

2. imposes additional requirements that are not expressly provided in the agreement;

3. is without rational support or cannot be rationally derived from the terms of the agreement; or

4. is based on general considerations of fairness and equity instead of the precise terms of the agreement.

*Cement Divisions, National Gypsum Co. v. United Steelworkers of America*, 793 F.2d 759, 766 (6th Cir.1986) (internal citations omitted). *See also Local No. 7 United Food and Commercial Workers International Union v. King Soopers, Inc.*, 222 F.3d 1223, 1227 (10th Cir.2000) (citing *Mistletoe Express v. Motor Expressmen's Union*, 566 F.2d 692, 694 (10th Cir.1977)) ("... an award does not draw its essence from the CBA if it is contrary to the express language of the contract ... or ... is so unfounded in reason and fact, so unconnected with the working and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator .... [or] if viewed in the light of its language, its context, and any other indicia of the parties' intention, it is without factual support."); *Conoco, Inc. v. Oil, Chemical & Atomic Workers International Union*, 26

---

1. We review an award of summary judgment *de novo*, giving no deference to the trial court's findings. *In re De–Annexation of Certain Real Property from City of Seminole*, 2004 OK 60, ¶8,

102 P.3d 120, 125 n. 12. Summary judgment is appropriate when there are no controversies as to any material facts and the moving party is entitled to judgment as a matter of law. *Id.*

F.Supp.2d 1310 (N.D.Okla.1998) (arbitration award draws its essence from CBA if it is "rationally inferable" in "some logical way" from the agreement).

■ ¶ 5 After reviewing the entire record and considering our limited standard of review, we affirm the district court's order vacating the arbitrator's award. The award did not draw its essence from the CBA because it imposed additional requirements on the City, and the decision was based on considerations of equity and fairness instead of the terms of the CBA.

¶ 6 At the time of Hankins discharge, the City of Perkins Police Department employed four officers, including the Police Chief, Robert L. Williams, and an officer serving on each of three patrol shifts. Officer Hankins was on the night patrol shift. Perkins has a population of approximately 2,300 and is 2.2 square miles in area. The City is also contiguous to the Iowa Indian Reservation, which encompasses 75 square miles. Significantly, City did not have its own radio dispatch capability or its own jail, so it relied on three agreements with the Iowa Tribe to provide these services.

¶ 7 First, the City and the Tribe had a "Memoranda of Understanding" to share the Tribe's dispatching service for 911 calls, traffic calls and other police calls for a monthly fee of $750. If the City had to purchase and maintain its own dispatching, it would greatly exceed this cost. Prior to this agreement, the City was only able to contract for part-time dispatching service until 2:00 a.m. The other two agreements were titled "Intergovernmental Co-operative Agreements." In the first of these, the two departments agreed to cross-deputize their officers by issuing special commissions to officers from the other department to respond to calls in either jurisdiction. This resolved jurisdictional problems that had previously existed between the two departments. The other agreement gave the City use of the Iowa Tribe's jail and booking services for the incarceration of people for municipal warrants and for municipal ordinance misdemeanors.

Prior to this agreement, the City had no method of jailing people for City purposes. The City paid a per-booking and per-day fee for the use of this facility. This agreement could be cancelled on 72-hours notice by either party if they objected to "any law, rule, policy or regulation of the other." The first two agreements were for the term of one year, but allowed for cancellation or amendment by either party by giving written notice. The agreements also required the use of best efforts to negotiate any differences in order to provide the public with the best law enforcement services.

¶ 8 By letter dated February 17, 2004, Tribal Chief Robert Fields terminated Hankins' privileges of using Tribal facilities. He cited misconduct at the Tribal facility on February 10, as reported in written statements by Tribal police dispatchers and jailers.[2] Police Chief Williams' investigation of the charges consisted only of speaking to five of the six persons who had given written statements to verify that they had actually written the statements attributed to them. Both Police Chief Williams and City Manager Rosson spoke to Tribal Chief Fields, and were informed that the termination of Hankins' privileges was total and permanent, and included all of the facility and the dispatching services. Chief Fields was adamant that he would not change his mind, and even stated Hankins would be arrested for trespassing if he came onto Tribal property. City Manager Rosson never told Chief Fields that he did not support the ban or found the ban unsatisfactory. Police Chief Williams then wrote a letter to Manager Rosson recommending that Hankins be terminated because he could not perform his duties, including receiving calls from dispatch and booking city misdemeanor violations, because the Tribe had terminated Hankin's privileges to use its facility. Manager Rosson terminated Hankins on March 5, 2004 on the basis that he could not perform his duties.

¶ 9 At the arbitration hearing, the parties stipulated that Article 6, § 3 of the CBA required "just cause" before City could ter-

---

**2.** The misconduct included Hankins and his civilian ride-along criticizing the competence of a Tribal Dispatcher in the presence of other Tribal staff, and Hankins "barking" his tires and speeding when he departed the Tribal property.

minate a police officer. The arbitrator also noted that Article 6 granted City the exclusive right to manage its affairs and direct its workforce. Further, City retained any rights not modified or abridged by the CBA, including the right to discharge. The arbitrator noted that City Policy listed certain conduct that would be "just cause" for termination such as offensive comments, and Department Policy required that employees address associates courteously and also cooperate with other law enforcement agencies. However, the City did not rely on Hankin's misconduct to justify the termination.

¶ 10 The arbitrator found there was ample evidence that Hankins made the disparaging comments to the dispatcher at the Tribe. He found Hankins would be subject to discipline under the CBA for the reasonable and foreseeable consequences of misconduct toward those with whom he was directed to work. The arbitrator further found Hankins had been placed on notice that misconduct would subject him to discipline. Further, the arbitrator found Hankins' ability to perform his duties was "severely impaired" when the Tribe terminated his right to use their facilities.

¶ 11 However, instead of determining whether Hankin's "severe impairment" in his ability to perform his duties would be just cause for termination under the CBA, *the arbitrator instead analyzed and interpreted the City's agreements with the Tribe.* The arbitrator analyzed the commercial reasonableness of the three agreements the City had with the Tribe and determined the City had a "lopsided interest in having the agreements continued," emphasizing the reliance of the City on the Tribe and the Tribe's ability to cancel the agreements on short notice and under a low threshold of justification. The arbitrator concluded the Tribe could not unilaterally withhold dispatching and booking rights from any particular member of the City police force, but the City lacked the bargaining strength to compel the Tribe to honor its contractual commitments. Significantly, the arbitrator found the Tribe had violated these agreements by banning Hankins and this act was "commercially un-

reasonable," even though the Tribe was not a party to the CBA or to this arbitration. *Based on his interpretation of the City's agreements with the Tribe,* the Arbitrator found:

> [T]he City has not shown, by a preponderance of the evidence, that the Grievant's conduct was primarily instrumental in impairing his capacity to serve as a police officer; rather, the *Arbitrator finds that the primary instrumentality was a commercially unreasonable action by the Tribe,* and the City's lack of capacity to dispute that decision. *Because the primary fault did not lie with the Grievant but with the City and its supplier of services, the Tribe,* the discharge of the Grievant did not constitute giving him the 'fair shake' required of just cause.

(Emphasis added).

¶ 12 We find the arbitrator's decision did not draw its essence from the CBA. His decision was based on his interpretation of City's agreements with the Tribe (rather than the CBA) and his decision that those agreements and the Tribe's actions were not commercially reasonable. His decision brought in a balancing of fault, which is an equity concept. It was based on his sense of equity and fairness and a desire that the City be in a better bargaining position so that its police department was not so reliant on the Tribal Police Department. The reality was that the City of Perkins Police Department did not have its own jail or its own dispatching services and had contracted with the Iowa Tribe to obtain those services as it was allowed to do under the CBA. By adding a requirement to the CBA that the City must prove that the fault for the termination of Hankins' privileges was primarily on Hankins instead of on the Tribe, the arbitrator added a requirement to the CBA and exceeded his authority. The arbitrator's decision did not draw its essence from the CBA. We therefore affirm the summary judgment order of the district court, which vacated the arbitrator's award.

¶ 13 AFFIRMED.

ADAMS, J., concurs; and

HANSEN, J., (sitting by designation), dissenting:

In my view, the majority construes the CBA too narrowly. The trial court erred in failing to enforce the arbitrator's decision. Its decision finding Hankins' discharge was not for "just cause" is supported by the evidence presented, and as such we should grant the required deference to the arbitrator. I therefore dissent.