**Robert T. McCANN, Plaintiff–Appellee,**

v.

**LITTON SYSTEMS, INC., Ingalls Shipbuilding Division, Defendant.**

**Ingalls Shipbuilding, Inc., Defendant–Appellant.**

**No. 91–1756.**

United States Court of Appeals, Fifth Circuit.

March 26, 1993.

Rehearing and Rehearing En Banc Denied April 29, 1993.

See also 767 F.Supp. 127.

Brooks Eason, Brunini, Grantham, Grower & Hewes, Jackson, MS, for defendant.

Linda Baggett Boozer, John H. Crouch, and William J. Powers, Jr., VP, Gen. Counsel, Pascagoula, MS, for Ingalls Shipbuilding, Inc.

Robert W. Smith and Catherine H. Jacobs, Biloxi, MS, for appellee.

Before WISDOM, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Robert T. McCann filed this action pursuant to the Age Discrimination in Employment Act (ADEA).[1] McCann alleges that Litton Systems, Inc., ("Litton")[2] forced him into retirement when he turned sixty-five years of age, thus engaging in unlaw-

---

**1.** 29 U.S.C. §§ 621–634 (1988).

**2.** Litton Systems, Inc., was the defendant of record in the district court. Ingalls Shipbuilding, Inc., as Litton's corporate successor, brings this appeal. For the sake of continuity, we refer to the defendant/appellant throughout as "Litton."

ful age discrimination. A district court jury found for McCann and assessed damages at $246,000. Litton subsequently moved for judgment *non obstante veredicto* and, in the alternative, a new trial. The district court denied Litton's motion. Finding that the evidence does not support a finding of constructive discharge, we reverse the district court's denial of the motion for judgment n.o.v.

## I

The evidence is uncontradicted that McCann was, and is, an excellent engineer. When he was hired by Litton in 1971 he had impeccable academic credentials and an excellent work record that encompassed twenty-five years of engineering experience. He extended that record at Litton and quickly ascended the engineering ranks there. In 1982, when he was sixty years of age, McCann was appointed Director of Design for the AEGIS Cruiser Program, a large government contract to build a class of ships for the United States Navy. McCann successfully performed the duties of that position for five years, earning above-average and outstanding performance reviews and receiving an award from the Navy for his work on the program.

As McCann's sixty-fifth birthday approached, however, the cruiser program evolved from its design, to its production stage. Consequently, the need for a Director of Design diminished. Francis Burger, the program manager for the AEGIS Cruiser Program and McCann's immediate superior, testified that the Navy had ordered 19 cruisers from the program and that the first seven of those had been delivered. As a result, "the design work was at an end. The field service and the construction was in its peak." Record on Appeal, vol. 2, at 89. Indeed, following McCann's retirement, the position of Director of Design for the AEGIS Cruiser Program was abolished. Although McCann's design staff dwindled to a quarter of its former size, he resisted transfer to a production position.[3]

At the same time, Litton was preparing a bid for the Navy's AEGIS Destroyer Program, and it transferred in a young engineer from its Washington, D.C., office. Richard Schenk was 33 years of age when he transferred to the Litton shipyards. His engineering pedigree, although not as lengthy as McCann's, is also impressive. On his transfer to the shipyard, Schenk was promised the position of design director for the AEGIS Destroyer Program— a position nearly identical to the one then held by McCann in the AEGIS Cruiser Program.

McCann, meanwhile, was receiving letters from the Litton pension department concerning his approaching sixty-fifth birthday, as well as personal inquiries from his superiors regarding his plans for retirement. The letters appear to have been routine correspondence.[4] The personal inquiries originated with Mark Farnum, a Litton vice president, who testified that, due to an imminent company-wide reduction, he ordered his subordinates to "canvass all of your people, all of them, and see what their intentions are so if we have any planned or potential attrition, this will count against the [reduction in force]." Record on Appeal, vol. 4, at 410. McCann testified that he was questioned twice

---

**3.** Both Burger and McCann testified that they had discussed a move to a waterfront production position. It is unclear from the testimony whether Burger offered McCann a waterfront job and McCann refused the offer, or whether Burger had suggested such a move and McCann had argued against it. *See* Record on Appeal, vol. 3, at 202–05, 291–92.

**4.** Both letters were mailed to McCann's home in 1986. The first advised him of his options under his pension plan. The second letter, mailed in December 1986, advised McCann that his "normal retirement date" would be the first of the month following his sixty-fifth birthday, or March 1, 1987, and invited McCann to visit the pension department to discuss "the various options available to you at retirement." Record on Appeal, vol. 3, at 136. The letter did not indicate an assumption that McCann would, in fact, retire on his "normal retirement date," but stated that McCann needed to visit the pension department "[e]ven if you plan to continue working past age 65 ... as there are several new benefits available that need your attention before you reach age 65." *Id.*

about his retirement plans, and that both times he responded that he had no intention of retiring at age sixty-five, that he planned to work until age seventy, "good work and health prevailing." [5] *Id.*, vol. 3, at 138.

January 1987 marked the beginning of the end of McCann's sixteen-year career with Litton. On January 10, McCann's remaining staff were transferred to work under Schenk, who had accepted the waterfront production position McCann had resisted. McCann was given a newly created position of Staff Director—a position without a description and little in the way of job duties. Mark Farnum, a Litton vice president, testified that the position of Staff Director was created for McCann after the decision to include him in the reduction in force had been made.[6] *See id.*, vol. 4, at 415.

Two weeks after being given the Staff Director position, McCann was told he was to be laid off as a part of a company-wide reduction in force. He was given the option of accepting three-weeks severance pay or working for three additional weeks. He chose to work.

During the next three weeks, he was told: (1) that he could work until March, when he would be eligible for retirement; (2) that he could accept a twelve percent pay cut and go to work for Schenk; or (3) that he could accept a transfer to Litton's Canadian division. McCann flatly rejected the transfer under Schenk, terming it an "insult" and complaining that the proffered position had no job description. Meanwhile, the Canadian transfer fell through, apparently as the result of a misunderstanding, and McCann decided to retire.

Before his retirement, however, McCann filed an age discrimination complaint through Litton's internal grievance procedure. Subsequent to his retirement, he filed a formal age discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"). *See* 29 U.S.C. § 626(d) (1988). The EEOC did not resolve the complaint within 180 days, and McCann requested and received a right-to-sue letter.

McCann filed suit in district court alleging, inter alia, that he was born on February 4, 1922; that he had ably performed his duties for Litton; that, throughout 1986, his supervisors at Litton had repeatedly questioned him about his retirement plans; that in early 1987 he refused a transfer

---

5. McCann contends on appeal that these two visits were Litton's attempt to "hound" him into retirement. Brief for McCann at 32. However, his testimony reflects otherwise:

> Q. [D]id you have any occasion to have oral inquiries by anyone at (Litton) about your retirement plans?
> A. (McCann) Yes. In late '86 I was asked by Bill Crabb [McCann's supervisor at the time] ... in fact, he called Ed Tregaskis and myself into his office and asked what our plans were with respect to retirement.
> Q. What did you tell Mr. Crabb?
> A. I told him I had no plan of retiring at age sixty-five and I had planned on working at least until age seventy, my health and good work prevailing....
> Q. Did you have occasion to have any other conversations with any other personnel?
> A. Yes. Subsequent to that, I would say a few weeks subsequent to that, [a different senior Litton officer] called me into his office and asked basically the same question, what were my plans for retirement. And I gave him the same answer I gave Mr. Crabb, that I didn't plan on retiring at sixty-five and that I planned to continue working to age seventy, hopefully, good work and health prevailing.

Record on Appeal, vol. 3, at 137–39. Elsewhere, McCann testified that he had "several" conversations with Burger concerning retirement. *See id.* at 222. Nowhere in the record, however, does McCann offer any evidence that these conversations were an attempt at harassment. Nor can we conclude from the number or frequency of the inquiries that such was the case.

6. Farnum was asked by Litton's counsel if he was familiar with the assigning of McCann to a position of staff director. Farnum replied:

> Only vaguely. I think that position was created really after we compiled the layoff list and had the list up. The company (Litton) also gave consideration to people who—it was a transition period. The intent was that we would get the layoff list, I think out by the end of January. The people who announced their intentions, that would take a retirement in the next six months, we could count them (in the reduction in force) and we could keep them in their trade. We had Ed Tregaskis and couple of others in that category. I think eventually Mr. McCann opted for the retirement and so we created a job ... for the interim period. That's the best I can recall.

Record on Appeal, vol. 4, at 415.

that entailed a decrease in pay; that he had been replaced by a younger man and forced to accept retirement in lieu of lay-off; and that Litton's actions in forcing his retirement constituted willful and unlawful age discrimination. *See* Record on Appeal, vol. 1, at 1–3.

The case was tried before a jury. At the close of McCann's case-in-chief, Litton moved for a directed verdict, arguing that McCann had failed to establish a prima facie case of age discrimination, failed to demonstrate Litton's specific intent to discriminate, and failed to plead and prove constructive discharge. After denying the motion, the district court submitted the case to the jury with the following instruction:

> In order for the plaintiff in this case to prevail on his claim of age discrimination, he must prove to you by a preponderance of the evidence, the following: First, that he is within the protected age group of forty to seventy years of age; and second, that he was actually or constructively discharged from his employment and that he was qualified to assume another position at the time of separation; and three, that his age was a determining factor in his separation, that the employer intended to discriminate on the basis of [age].

*Id.*, vol. 4, at 461–62. The court defined "constructive discharge" as a situation in which "an employer makes an employee's work condition so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to [retire]." *Id.* at 463.

Neither McCann nor Litton objected to the jury instructions. The jury returned a verdict for McCann, assessing damages at $246,000 in back pay. Litton moved for judgment n.o.v., arguing again that McCann had failed to prove both age discrimination and constructive discharge.

Litton also moved, in the alternative, for a new trial, arguing that the jury verdict was against the great weight of the evidence. The district court denied Litton's motion and entered judgment for McCann.

Litton contends on appeal that the evidence before the district court jury was insufficient as a matter of law to support a verdict for McCann. Specifically, Litton argues that the evidence does not support either a finding of (a) constructive discharge or (b) age discrimination, and that (c) the district court erred in denying its motion for a new trial. Because we agree with Litton's first argument, we do not reach the others.

## II

### A

■ In an appeal from the denial of a judgment n.o.v., our review of the district court proceedings is limited. *See Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc). To reverse the district court's denial of a judgement n.o.v., "the facts and inferences [must] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Id.* at 374. However, if reasonable persons could disagree as to the verdict, a judgment n.o.v. is inappropriate, and we must affirm. *See id.* Moreover, we must examine the evidence in the light most favorable to the appellee. *Stephens v. C.I.T. Group/Equipment Financing Co.,* 955 F.2d 1023, 1027 (5th Cir.1992).

### B

■ As part of his age discrimination claim, McCann had to show that he was either actually or constructively discharged.[7] *See Stephens,* 955 F.2d at 1027

---

7. Citing *Wilson v. Monarch Paper Co.,* 939 F.2d 1138 (5th Cir.1991), McCann maintains that constructive discharge is not a necessary element of an age discrimination cause of action. In *Wilson,* the court instructed the jury, without objection, that it could find for the plaintiff if it determined that the plaintiff was discriminatorily "reassigned"—not constructively discharged.

*See id.* at 1146 n. 8. Thus, the jury instruction omitted constructive discharge as an element of an age discrimination claim. Here, jury instructions, also given without objection, properly included constructive discharge as an element of an age discrimination claim. In both cases—barring a fundamental error resulting in a miscarriage of justice—the jury instructions

("In order to prove a prima facie case of age discrimination, a plaintiff must show, among other things, that he was discharged from his position."). Constructive discharge occurs when "the working conditions are so difficult or unpleasant that a reasonable person in the employee's shoes would feel compelled to [retire]." *Id.* (quoting *Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980)). Litton argues that two of our prior decisions—*Jurgens v. E.E.O.C.*, 903 F.2d 386, 390 (5th Cir.1990) and *Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748 (5th Cir.1986), *aff'd in part and remanded in part on other grounds*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)—particularly support its argument that constructive discharge, as a matter of law, was not shown. *See* Brief for Litton at 26–30.

In *Jett*, a high school athletic director/head football coach was transferred to a different high school and demoted to freshman football coach. *See id.* at 751–52. The transfer, which followed a month-long public dispute between the coach and his high school principal, prompted the coach to "resign from the public education field with much sorrow and humiliation." *Id.* at 755. The coach sued his former principal and school district, and a jury found that the coach had been constructively discharged for racially discriminatory reasons. *See id.* at 752. We reversed, finding that, as a matter of law, the coach had not been constructively discharged. We noted that "a demotion or transfer in some instances may constitute constructive discharge." *Id.* at 755. However, we held that the coach's loss of responsibility "was not so intolerable that a reasonable person would have felt compelled to resign." *Id.* We further noted that the proper inquiry in a constructive discharge case is whether an objectively reasonable person would have been compelled to resign, and not whether the plaintiff had, in fact, felt compelled to resign. *See id.* ("constructive discharge cannot be based upon the employee's subjective preference").

We faced a similar, albeit more complicated, situation in *Jurgens*. There, plaintiff Jules H. Gordon, an EEOC attorney, was told to choose between early retirement and demotion as a part of an agency-wide reorganization. *See id.* at 388. At the time, Gordon was employed as an Assistant Regional Attorney with a Civil Service grade of GS–15 and an annual salary of $45,792. *See id.* His responsibilities included setting legal policies and deciding the trial strategies for a staff of seven to twelve subordinate attorneys. *See id.* To forego early retirement, Gordon's only option was to accept a position as a Supervising Trial Attorney, a GS–14 position with supervision of only three to five attorneys and no managerial responsibilities. He chose early retirement. *See id.* We found that Gordon had not been constructively discharged because his new position, "though subjectively undesirable to Gordon, was not inherently demeaning, especially when it was offered as part of a comprehensive, ... neutral [reduction in force]." *Id.* at 392. We also stated that "a slight decrease in pay coupled with some loss of supervisory responsibilities is insufficient to constitute a constructive discharge," *id.* at 392, because constructive discharge requires additional "aggravating factors." *Id.* at 393 (citing *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1077 (5th Cir.1981)).

We found such aggravating factors in our most recent decision construing the constructive discharge doctrine in the age discrimination context.[8] *See Stephens*, 955 F.2d at 1027–28 (discussing constructive discharge in light of the holdings in *Jett* and *Jurgens*). In *Stephens*, the plaintiff was demoted, with an accompanying cut in pay and reduction in responsibilities. He

---

control our review. *See* Fed.R.Civ.P. 51; *Mairena v. Foti*, 816 F.2d 1061, 1064 n. 2 (5th Cir. 1987) (reviewing propriety of jury instructions for miscarriage of justice where no objection made), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988). Accordingly, McCann had to show constructive discharge.

8. *See also Davis v. First Nat. Bank of Killeen, Tex.*, 976 F.2d 944, 949 (5th Cir.1992) (assuming, without deciding, that constructive discharge occurred in determining merits of age discrimination claim).

resigned and sued under the ADEA, alleging constructive discharge. We affirmed the jury's finding of constructive discharge, holding that

> the cumulative effect of CIT's actions made the working conditions so intolerable that a reasonable person would have felt compelled to resign. Therefore, the district court did not err in denying CIT's motion for judgment n.o.v.
>
> The evidence shows that Stephens was demoted from Division Head to DSM, a sales position, and was asked to help train his young successor, Roy Keller. As a DSM he had no supervisory duties, and in fact had to report to Keller. He was asked to explain his demotion and introduce Keller as the new boss to the division's biggest client, Holt Machinery. He was first told that he alone would handle the Holt Machinery account, but was later informed that "ultimately, [Keller] is Division Manager and will make the decisions on how the account will be handled." Stephens, who had formerly supervised the entire San Antonio Division, was also informed that "he was permitted to assist the Credit Department as needed" but that "whenever possible, [he] must have a member of the credit department along as designated by Division Management." On top of all this, his salary was reduced from $53,-500, to $43,200 after he had been told that there would be no reduction in his salary. Finally, each time CIT imposed a new restraint on Stephens or cut his salary or responsibility, Keller asked him whether he was going to quit his job.

*Id.* at 1027 (alterations in original) (citations omitted).

■ We think it clear from this recitation of "aggravating" factors that *Stephens* is distinguishable from the instant case, and we conclude that the facts before us make *Jett* and *Jurgens* the controlling precedent. McCann argues that he was constructively discharged because he was given the option—in the midst of a company-wide reduction in force [9]—of either (1) retiring, or (2) transferring to a new position at a 12% pay cut, under the supervision of a man half his age. *See* Brief for McCann at 25. In addition, McCann claims that his new position as program coordinator was not well defined, *see id.*, and that "he would be deprived of his secretary and subordinates." *Id.* at 27. Aside from the fact that McCann was asked to work for a much younger man, we find the instant facts nearly identical to those we faced in *Jurgens*—i.e., McCann faced a slight decrease in pay coupled with a loss of some supervisory responsibilities. As we held in *Jurgens*, these factors alone cannot constitute constructive discharge.

■ Although requiring an employee to work for a much younger person could create, under certain circumstances, intolerable working conditions, *see Stephens*, 955 F.2d at 1027, such circumstances did not exist here. Unlike the plaintiff in *Stephens*, McCann apparently could have had Schenk's production position if he so desired. *See* Record on Appeal, vol. 3, 202–05, 291–92. Moreover, McCann was not told to train his successor,[10] and was in no way personally humiliated by the proffered demotion, as was Stephens when he "was asked to explain his demotion . . . to the division's biggest client." *Stephens*, 955 F.2d at 1027. Nor was McCann harassed as was Stephens in that "each time CIT imposed a new restraint . . . Keller asked him whether he was going to quit his job." *Id.*

■ Furthermore, we have held that both the permanence of the demotion and whether the demotion is a "harbinger of dismissal," are "factor[s] to consider under the constructive discharge analysis." *Id.* at 1028 (quoting *Jurgens*, 903 F.2d at 392). Here, there is no evidence to indicate that the demotion offered to McCann was either

---

9. The record reveals no evidence that McCann was treated any differently than any other employee included in the reduction in force.

10. Because Schenk was not hired to replace McCann as the Design Director on the AEGIS Cruiser Program, a position which was being phased out when Schenk was hired, *see* Record on Appeal, vol. 2, at 89, Schenk cannot even be termed McCann's successor.

permanent or a "harbinger of dismissal." Indeed, the evidence is quite to the contrary, indicating that Litton was doing everything in its power to keep McCann on the payroll.[11] Accordingly, we conclude—based upon the cumulative effect of Litton's actions—that a reasonable jury could not have found that Litton made McCann's working conditions "so intolerable that a reasonable person would have felt compelled to [retire]." *See id.* at 1027.[12]

## III

For the foregoing reasons, we REVERSE the district court's denial of Litton's motion for judgment n.o.v., and we RENDER judgment for Litton.

---

**11.** For example, as a third option, Litton asked McCann if he would consider a transfer to its Canadian division, *see* Record on Appeal, vol. 3, at 237, where he had previously worked for a short time in 1978. *See id.* at 133.

**12.** The other evidence offered by McCann—e.g., the preferential treatment of Schenk—speak, not to the issue of constructive discharge, but to the issue of whether McCann was discriminated against. Even assuming, arguendo, that McCann was discriminated against, the doctrine of constructive discharge requires that McCann show acts beyond that of the discrimination itself. *See Jett,* 798 F.2d at 755 (holding that "unlawful discrimination ... alone cannot constitute such an aggravated situation that a reasonable employee would feel forced to resign").