# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

No. 97-60030

---

JOE F. BOEHMS,

Plaintiff-Appellant-
Cross-Appellee,

versus

CRAVEN CROWELL, in his official capacity as
a member of the Board of Directors of the Tennessee
Valley Authority; BILL KENNOY, in his official
capacity as a member of the Board of Directors of the
Tennessee Valley Authority; JOHNNY HAYES, in
his official capacity as a member of the Board of
Directors of the Tennessee Valley Authority,

Defendants-Appellees-
Cross-Appellants.

---

Appeals from the United States District Court
for the Northern District of Mississippi

---

April 15, 1998

Before HIGGINBOTHAM and STEWART, Circuit Judges, and WALTER,[*] District Judge.

STEWART, Circuit Judge:

This case, which calls for us to decide among other things the recoverability of attorney's fees in an Age Discrimination in Employment Act ("ADEA") suit against the government, arises from Joe Boehms' 1992 nonselection as manager of the Tennessee Valley Authority's Customer Service Center in Tupelo, Mississippi.[1] The court below found that Boehms' nonselection was age-based discriminatory, but refused to extend Boehms' back pay award beyond the date of his consequent

---

[*]District Judge of the Western District of Louisiana, sitting by designation.

[1]The Tennessee Valley Authority ("TVA"), by virtue of being a public corporation, is an executive agency of the federal government. See 16 U.S.C. § 831; 5 U.S.C. § 105.

retirement. Mindful of Boehms' limited recovery, the court awarded him attorney's fees.

On appeal, Boehms challenges only the court's decision to limit his back pay award. Defendants Craven Crowell, Bill Kennoy, and Johnny Hayes, acting in their official capacities as members of the Board of Directors of TVA (collectively, "defendants"), cross-appeal the determination of liability, the award of attorney's fees, and the finding that Boehms sufficiently mitigated his damages during the time between his nonselection and retirement. We reverse the award of attorney's fees and remand for further proceedings. Otherwise, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1961, Joe Boehms ("Boehms") began working as an engineering aide for TVA's power business. At the time, this business was organized into two separate divisions, the power systems operations division (the "operations division") and the power use and distributor relations division (the "marketing division"). The operations division produced electricity and constructed and maintained TVA's transmission lines; it ensured that TVA's distributors (*i.e.,* its customers) received TVA's final product -- electricity. The marketing division, of which Boehms became an employee, administered TVA's power contracts, maintained distributor relations, and promoted efficient electricity use in the community.

In 1988, in connection with an extensive reorganization aimed at decentralizing TVA's central offices and bringing decision-making closer to its distributors, TVA scrapped its divisional structure and placed the previously separate "operations" and "marketing" functions under the unified command of fifteen (15) district offices. Boehms, who had steadily risen through the management ranks of the marketing division, was appointed manager of TVA's Tupelo, Mississippi district. For the first time in his career, Boehms became directly responsible for making day-to-day operations-related decisions. Despite Boehms' claimed difficulty in learning the necessary skills, TVA acknowledges that his overall performance as district manager was viewed favorably by both supervisors and Tupelo district distributors.

In April of 1991, TVA effected another reorganization, downsizing its fifteen (15) district

2

offices into thirteen (13) customer service centers. Effective January 20, 1992, each customer service center ("CSC") was to be headed by a CSC manager, who in turn, was to be assisted by a CSC operations manager and a CSC marketing manager. Hoping to retain his command over the Tupelo office, Boehms applied for the CSC manager position. He was 55 years old at the time.[2]

On January 14, 1992, Boehms' supervisor, Glenn Parrish, informed Boehms that Van Wardlaw, Boehms' 32-year old subordinate, was being offered the Tupelo CSC manager position, and that the position of CSC operations manager was available if Boehms so desired it.[3] Deeming the offer a "demotion," Boehms rejected it. Parrish immediately handed Boehms a pre-prepared letter informing him that his job was being "surplussed," and that he had the option of either resigning or entering the Employee Transition Program ("ETP"). Boehms chose to enter the ETP, which allowed him to remain with TVA for up to six months while he looked for similar employment both within and without TVA.

While in the ETP, Boehms twice rejected offers for the West Point, Mississippi CSC operations manager position, and refused to entertain numerous other advertised operations manager positions. Not once did a CSC manager position become available during this time. In November of 1992, having been unsuccessful in his efforts to secure suitable employment, Boehms was "reduced in force." Boehms invoked his retirement privileges before departing.[4]

In January of 1994, Boehms sued TVA, alleging, *inter alia*, that TVA violated ADEA § 633a when it refused to offer him the Tupelo CSC manager position. Boehms asserted that his experience as district manager made him the superior candidate for the position, and that his nonselection was

---

[2]While the 1991 reorganization was being implemented, Boehms' job title was changed from "district manager" to "regional service manager." Because this change was purely cosmetic, and did not accompany a change in duties, we will continue to use the term "district manager" to refer to Boehms' pre-1992 position at Tupelo.

[3]Parrish became Boehms' supervisor in connection with TVA's 1991 reorganization. Prior to the January 14, 1992, meeting, Parrish had been Boehms' supervisor for approximately eight (8) months.

[4]Boehms continued his search for employment after retiring from TVA. This search ended in April of 1994, when he accepted a managerial position with the Okolona Electric Department, a customer of TVA's.

due to age. As evidence of age discrimination, he presented, among other things: (1) Parrish's interview notes reminding him (Parrish) not to talk about age; (2) testimony that each district manager under Parrish's authority that was younger than 45 was offered a CSC manager position; and (3) testimony that each district manager under Parrish's authority that was older than 45 was not offered a CSC manager position, but instead was offered a CSC operations manager position. In response, TVA contended that Boehms' nonselection was due to his negative "approach to organizational change" and his lack of an "aggressive and proactive leadership style." TVA argued that its business judgment in this regard should not be disturbed.

The parties agreed to a bench trial before a magistrate judge. On May 15, 1996, the court held that Boehms was subjected to age discrimination when he was not selected for the CSC manager position, and that he sufficiently mitigated his damages by participating in the ETP program (*i.e.,* he was not required to accept the Tupelo, or any other, operations manager positions that became available). On October 1, 1996, after receiving further briefing on the issue of damages, the court decided that the circumstances surrounding Boehms' retirement did not amount to a constructive discharge, and therefore, his back pay award should not extend beyond his November 1992 retirement.[5] Noting Boehms' limited recovery, however, the court awarded him "a reasonable attorney's fee." Contesting the limitation on damages, Boehms filed a motion to alter and amend the judgment, which the court rejected on December 20, 1996. As explained above, the parties now challenge various aspects of the lower court's resolution of this case.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

ADEA § 633a(a) provides, in pertinent part, that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . of the Federal Government . . . shall be made free from any discrimination based on age." 29 U.S.C. §

---

[5]Boehms was awarded the sum of $4,688.24, reflecting the back pay for the period between his nonselection on January 15, 1992, and his retirement on November 13, 1992.

4

633a(a). An ADEA plaintiff, suing under § 633a, may use either direct or circumstantial evidence to prove that intentional age discrimination occurred. Woodhouse v. Magnolia Hosp., 92 F.3d 248, 252 (5th Cir. 1996).

In the instant case, TVA contends that the evidence was insufficient to support the lower court's holding that Boehms' nonselection was motivated by discriminatory animus, and argues that the court's finding erroneously nullified Parrish's sound business judgment in finding Wardlaw to be the better qualified candidate. In considering such a sufficiency challenge, we view the evidence in the light most favorable to the verdict, and defer to all reasonable inferences made by the trial court in support of its judgment. A trial court's ultimate factual finding of discriminatory intent will not be reversed unless it is clearly erroneous. E.E.O.C. v. Bailey Ford, Inc., 26 F.3d 570, 572 (5th Cir. 1994).

The burden-shifting framework through which an ADEA plaintiff develops evidence from which a factfinder may infer discrimination is well established. First, the plaintiff must establish by a preponderance of the evidence a prima facie case of discrimination, after which the burden shifts to the defendant to advance a legitimate, nondiscriminatory reason for the challenged employment action. Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 992-93 (5th Cir. 1996) (en banc). Once the defendant meets this burden of production, the plaintiff must demonstrate that the defendant's proffered explanation is not the actual reason for its decision, but is instead a pretext for discrimination. Id. at 993.

Because the ebb and flow of burden-shifting is intended to apply at *interim* stages of a proceeding -- *i.e.,* when a party's rights are affected by a record containing less than full proof, see Smith v. Farah Mfg. Co., Inc., 650 F.2d 64, 68 (5th Cir. 1981) -- a reviewing court need not examine the adequacy of the showing at any stage of the burden-shifting framework after a case has been fully tried on the merits. Woodhouse, 92 F.3d at 252-53. Rather, when both parties have been allowed to present their full proof, a reviewing court's duty is simply to determine "whether there was sufficient evidence from which a reasonable trier of fact could have concluded that age discrimination

occurred." Id.

In making this determination, we must examine both the direct and circumstantial evidence supporting the factfinder's ultimate conclusion that age was a determinative factor in the challenged employment decision. Id. at 253. "Although age need not be the sole reason for the adverse employment decision, it must actually play a role in the employer's decisionmaking process and have a determinative influence on the outcome." Id.

TVA argues that Mr. Parrish simply exercised prudent business judgment in finding Wardlaw to be the better qualified CSC manager candidate, and that the trial court's judgment amounted to unwarranted "judicial second-guessing of [his] employment decision." Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 959 (5th Cir. 1993). At trial, Parrish claimed that Boehms was unfit for the Tupelo CSC manager position because he lacked both an innovative leadership style and had a negative approach to organizational change. Parrish's low measure of Boehms was corroborated by an October 1991 employee evaluation form, in which Parrish gave Boehms "low" marks in the areas of "innovating," "oral communications," and "subordinate development," and stated that Boehms "need[ed] to take more risks." Testimony adduced at trial indicates that Parrish's negative assessment of Boehms stemmed principally from Boehms' alleged failure to proactively: (1) curtail the encroachment of a creek onto property containing one of TVA's high voltage transmission towers; (2) handle negotiations between one of TVA's distributors and the distributor's customer concerning a heat pump loan; and (3) manage an employee's complaint concerning overtime.

Our review of the record reveals considerable evidence to suggest that Parrish's negative evaluation of Boehms in this regard was overblown, if not disingenuous, and that Boehms was in fact extremely qualified for the Tupelo CSC manager position. Defendants concede on appeal that Boehms' "skills and performance as a district manager were recognized and appreciated by [both] his supervisors and [TVA's] customers." Several reliable witnesses -- among them current and former employees of the Tupelo office (*i.e.,* Ebb Loden, Jr., Sherry Garrett, William Long), as well as managers of Tupelo office customer-distributors (*i.e.,* Mr. Hollowell, Mr. Grisham, Mr. Collier) --

6

testified that the duties of the new CSC manager position were virtually *identical* to those commendably performed by Boehms as district manager.[6] In addition, Eddie Trammel -- Boehms' direct supervisor from October 1988 through April 1991 and the CSC manager of TVA's Johnson City Customer Service Center at the time of trial -- testified that Boehms possessed all the skills necessary to perform the duties of Tupelo CSC manager. Trammell's testimonial claim was substantiated by his favorable evaluations of Boehms during the time he (Trammell) was Boehms' supervisor. In fact, Parrish's subdued October 1991 employee evaluation of Boehms, based on a mere five months of supervision, was the sole blemish in Boehms' otherwise impressive track record of favorable appraisals concerning his performance as district manager. In light of this evidence, we cannot say that the trial court's finding that Parrish's stated reasons for Boehms' nonselection (*e.g.*, failure to manage an employee's overtime problem) were "blown out of proportion." Our review of the record indicates that Parrish's explanations for Boehms' shortcomings were pretextual in nature, and were likely made to justify the subsequent offer to him of the subordinate operations manager position.

Furthermore, while the ADEA should not "transform the courts into personnel managers," it clearly is intended to protect older employees from employment decisions "which are unlawfully motivated." Bienkowski v. American Airlines, Inc., 851 F.2d 1503, 1508 (5th Cir. 1988). While mere acceptance of an employee's favorable assessment of his own qualifications generally cannot permit a factfinder to conclude that an employer's reasons for a challenged employment action are pretextual, the presence of other evidence -- for example, "information about the ages of other employees in plaintiff's position, the treatment and evaluation of other employees, or the employer's variation from standard evaluation practices" -- may suffice to tip the scales in favor of a finding of discriminatory intent. Id; see also Rhodes, 75 F.3d at 994 ("A jury may be able to infer discriminatory

---

[6]On this point, we note that the position of CSC manager, like the former position of district manager, maintained full authority over the Tupelo office's operations and marketing. Moreover, this authority was executed under similar staff and budgetary constraints: whereas the former district manager (*i.e.*, Boehms) supervised 53 employees under an operating budget of $2.6 million, the new CSC manager supervised 49 employees under an operating budget of $ 3.3 million.

intent in an appropriate case from substantial evidence that the employer's proffered reasons are false.").

Here, we observe that each of the former district managers under Parrish's authority that was younger than the age of 45 was offered a CSC manager position. We also observe that each of the former district managers under Parrish's authority that was older than the age of 45 was not offered a CSC manager position, but instead was offered a CSC operations manager position. In light of numerous witnesses' credible testimony indicating that the duties and obligations of the district manager position were analogous to those of the new CSC manager position, we refuse to view Parrish's selections in this regard as coincidental, or (for that matter) justifiably premised on the candidates' qualifications. Rather, we perceive Parrish's selections to have been infected by discriminatory animus. Moreover, Parrish's own interview notes -- which contained the notation "[d]on't talk about age" -- demonstrate that he was cognizant of Boehms' age during the interview process. In sum, our review of the record confirms the presence of substantial evidence indicating that Parrish's rationale for Boehms' nonselection (*i.e.,* Boehms was unqualified based on his handling of certain managerial problems) was a pretext for illegal age discrimination. We conclude that the magistrate's finding that Boehms was discriminated against on the basis of age was not clearly erroneous.

## II. DAMAGES

In reviewing a trial court's determination of damages, we examine all issues of law de novo. Rhodes v. Guiberson Oil Tools, 82 F.3d 615, 620 (5th Cir. 1996). "Absent an error of law, [the court's] award of compensatory damages presents an issue of fact, subject to the clearly erroneous standard of review." Id.

## A. Mitigation

In the instant case, the trial court found that Boehms reasonably mitigated his damages by entering the ETP, and by searching for substantially similar employment both before and after his

8

retirement from TVA.[7] According to the magistrate, Boehms was not required to accept the Tupelo operations manager position in order to satisfy his duty to mitigate, despite the fact that his salary in that position would have been identical to the one he had earned as district manager. This finding was based on an assessment that the operations manager position was "inferior" to the CSC manager position, both in status and supervisory and budgetary authority.[8] A trial court's finding that a plaintiff reasonably mitigated his damages is a factual determination, reversible on appeal only if clearly erroneous. Id.

On the basis of our holding that "where an employer discriminatorily denies promotion to an employee, that employee's duty to mitigate damages encompasses remaining on the job," Jurgens v. E.E.O.C., 903 F.2d 386, 389 (5th Cir. 1990), defendants contend that Boehms failure to continue his "existing employment relationship" with TVA -- i.e., by refusing each of the operations manager positions that became available after his nonselection -- constituted a breach of his duty to mitigate damages. We reject this argument, simply on the basis that Boehms -- unlike a typical nonselectee for a promotion -- did not have the option to remain in his "existing employment relationship." As discussed, the position of Tupelo district manager, Boehms post for over two years, was being eliminated pursuant to TVA's reorganization implementing customer service centers. The operations manager position, although it would allow Boehms to "remain on the job" in some sense, brought with it only a subset of the supervisory and budgetary responsibilities of the former district manager position. In such circumstances, we find that it was impossible for Boehms to "remain [in his

---

[7]As discussed above, Boehms was unsuccessful in his efforts to secure suitable employment during his stint in the ETP. Boehms did not find an acceptable job until over a year and a half after he retired from TVA, when he took a managerial position with a TVA customer.

[8]In this regard, we note that the operations manager position showed an operating budget of $2 million with supervision over approximately 32 employees. By comparison, the former district manager position showed an operating budget of $2.6 million with supervision over 53 employees and the CSC manager showed an operating budget of $3.3 million with supervision over 49 employees. In addition, testimony elicited from a number of current and former employees of TVA, as well as from several managers of Tupelo office customers, establishes that the operations manager position would have been a "demotion" for Boehms. Lastly, it does not escape us that, by offering Boehms the operations manager job, Parrish was asking Boehms to report directly to a man who, just the day before, had been Boehms' subordinate.

existing] job," and therefore, we decline to apply our holding in <u>Jurgens</u> to this case.

Defendants next contend that if in fact Boehms' nonselection to the position of CSC manager was aged-based discriminatory, Boehms' damage award should reflect his subsequent failure to diligently seek replacement employment. <u>See</u> <u>Sellers v. Delgado Community College</u>, 839 F.2d 1132, 1139 (5th Cir. 1988) ("If an employer proves that an employee has not made reasonable efforts to obtain work, the employer does not have to establish the availability of substantially comparable work."). Defendants argue that once Boehms voluntarily entered the ETP, a position without supervisory responsibilities or an operating budget, he had a duty -- under the "reasonable efforts" standard -- to accept any employment that would "better" his position from that *in the ETP*. According to defendants, Boehms breached this duty, and thus failed to mitigate his damages, by "steadfastly refus[ing]" to accept any of the several operations manager positions that became available while he was in the ETP.

We are unimpressed by this argument, as it would lead to the untenable result that a claimant in Boehms' position must accept almost any position that becomes available while participating in a temporary employee assistance program -- provided it qualifies, as it likely will, as an improvement over his position therein. This court has noted, in the context of a Title VII failure to promote case (sex discrimination), that a claimant breaches his duty to "exercise reasonable diligence to minimize damages," and "forfeits his right to backpay[,] if he refuses a job substantially equivalent to the one he was *discriminatorily denied*." <u>E.E.O.C v. Exxon Shipping Co.</u>, 745 F.2d 967, 977 (5th Cir. 1984) (citing <u>Ford Motor Co. v. E.E.O.C</u>, 458 U.S. 219, 232 102 S.Ct. 3057, 3065, 73 L.Ed.2d 721) (1982) (emphasis added). Therefore, our focus in a mitigation analysis -- and the base from which all comparisons about whether "reasonable efforts" to obtain comparable work are made -- must be the employment position with respect to which discrimination occurred.

Defendants' contention that Boehms was required to accept any employment that would "better" his position from that *in the ETP* is therefore meritless under our holding in <u>Exxon Shipping</u>. We have already determined under the instant facts that Boehms was discriminatorily denied the

10

position of *Tupelo CSC manager*. Defendant's brief makes no claim that Boehms failed to use reasonable efforts to seek substantially similar or "better" employment *vis a vis* the denied CSC manager position. After a careful review of the record, we are convinced that the magistrate did not commit clear error in finding (1) that Boehms' duty to mitigate damages was satisfied by his participation in the ETP, and (2) that this duty was not breached by his refusal to accept any operations manager positions during the ensuing six-month period.

## B. Determination of Damages

The parties next dispute whether the magistrate correctly determined that Boehms was not owed back pay beyond his November 1992 retirement from TVA. After requesting and receiving further briefing on this issue, the magistrate found that the controlling case requires an employee to prove constructive discharge before post-retirement back pay may be awarded, and that, under the facts of this case, Boehms could not establish the "aggravating factors" necessary to support such a finding. See McCann v. Litton Systems, Inc., 986 F.2d 946, 951 (5th Cir. 1993). In so holding, the magistrate particularly noted that Boehms' situation was not materially distinguishable from the former district managers who voluntarily chose to remain with TVA as CSC operations managers.

In Jurgens v. E.E.O.C., 903 F.2d 386 (5th Cir. 1990), a similar discriminatory denial of promotion case, we were also called upon to decide whether the trial court correctly applied the constructive discharge rule to limit the plaintiff's recovery to *pre-retirement* back pay. In Jurgens, Jules Gordon, an EEOC Assistant Regional Attorney responsible for establishing trial strategies and supervising seven to twelve attorneys, was denied a promotion to the position of Regional Attorney on the basis of his race. Jurgens, 903 F.2d at 387-88. Approximately three years later, pursuant to a neutral agency-wide reorganization, the EEOC targeted the position of Assistant Regional Attorney for elimination. Id. at 388. To accommodate Gordon, the EEOC offered him two options: (1) a demotion to the position of Supervisory Trial Attorney, a station with no managerial responsibilities and supervision of only three to five attorneys; or (2) an early retirement, triggering an annual $15,000 annuity. Id. Perceiving the offer of the Supervisory Trial Attorney position to be degrading,

11

Gordon chose to retire from the EEOC and then sued for discriminatory failure to promote. Id. As damages, he sought, *inter alia*, compensation for lost wages beyond the effective date of his retirement. Id.

Because we perceived that the "policies underlying [anti-discrimination] laws [are] best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships," id. at 390 (quoting Bourque v. Powell Electric Mfg. Co., 617 F.2d 61, 65-66 (5th Cir. 1980)), we held that 'in order for [Gordon] to recover back pay for lost wages beyond the date of his retirement or resignation, the evidence must establish that [he was] constructively discharged [by the EEOC]." Id. at 389. Because the offered position of Supervisory Trial Attorney was not "inherently demeaning, especially when it was offered as part of a racially neutral reorganization," id. at 392, we found the circumstances surrounding Gordon's retirement insufficient to establish a constructive discharge. Gordon was thus not owed back pay beyond the date of his retirement.

Boehms argues that the constructive discharge rule articulated in Jurgens should not be applicable under the instant facts because his "retirement" from TVA was in fact an *actual* discharge (*i.e.,* a termination). In making this claim, Boehms alerts us to the fact that he was "reduced in force" when his stint in the ETP came to an end. We disagree with Boehms' position, and note that the instant facts are nearly identical to those observed in Jurgens -- *i.e.*, after a discriminatory denial of promotion, Boehms (like Gordon) was offered a one-level demotion and a loss of some supervisory responsibilities.[9] Because no finding was made in Jurgens that these circumstances constituted an actual discharge, and because such a finding (or lack of finding) was indeed sound, we refuse to hold otherwise here. As such, to recover back pay beyond the date of his retirement, Boehms must show that he was constructively discharged from TVA.

When he chose to retire from TVA, Boehms had, at the very least, an offer to remain as Tupelo CSC manager at the same salary he had been earning as district manager. In addition, several

_____

[9]The position of operations manager continued to be available at the time of Boehms' departure from TVA (*i.e.*, after his six-month stay in the ETP was complete).

district managers other than Boehms accepted positions as CSC operations managers pursuant to TVA's agency-wide reorganization. These facts alone convince us that the working conditions that would have confronted Boehms as operations manager were "not so intolerable that a reasonable person would have felt compelled to resign," Jett v. Dallas Indep. School Dist., 798 F.2d 748, 755 (5th Cir. 1986), or that the offer of the operations manager position was itself a "harbinger of dismissal." McCann, 986 F.2d at 952. While (1) we lend a sympathetic ear to Boehms' claim that it makes little sense to hold, on the one hand, that acceptance of the operations manager position *was not required* to mitigate damages, but hold, on the other hand, that it *was required* to recover back pay beyond the date of retirement; and (2) we acknowledge as persuasive his claim that had he accepted the operations manager position, he may have been eligible to receive the non-mitigated portion of his damages beyond November of 1992 (*i.e.,* the date of his retirement), we nonetheless are bound by our precedent under Jurgens to hold as we do. The magistrate did not err in applying the constructive discharge rule to find that Boehms' back pay recovery did not extend beyond the date of his retirement.

## III. ATTORNEY'S FEES

Lastly, we consider defendants' claim that the magistrate erroneously awarded Boehms attorney's fees under the ADEA. The magistrate reasoned that our decision in Smith v. Office of Personnel Management, 778 F.2d 258, 264 (5th Cir. 1985), cert. denied, 476 U.S. 1105, 106 S.Ct. 1949, 90 L.Ed.2d 358 (1986), allowed attorney's fees awards to stand against the federal government, and that the purposes of the ADEA would "clearly" be effectuated by an award in this case, *i.e.*, given Boehms' rather limited recovery. We review the trial court's decision to award attorney's fees for an abuse of discretion. E.E.O.C. v. Clear Lake Dodge, 60 F.3d 1146, 1153 (5th Cir. 1995).

Section 633a of the ADEA, which authorizes federal employees such as Boehms to bring suit on age discrimination claims, was enacted in 1974, roughly seven years after the private sector ADEA scheme was introduced. Lewis v. Federal Prison Indus., Inc., 953 F.2d 1277, 1283 (11th Cir. 1992).

13

Subsection (c) of section 633a provides that a claimant in a civil action may receive "such legal and equitable relief as will effectuate the purposes of [the ADEA]." 29 U.S.C. § 633a(c). In 1978, Congress amended section 633a to include subsection (f), which provides that the provisions applicable to governmental employees "shall not be subject to, or affected by, any provision of [the ADEA], other than . . . the provisions of . . . [section 633a] [and one irrelevant exception]." As such, because section 633a comprises a "separate and discrete [ADEA] remedial scheme" for federal public sector employees, Lewis, 953 F.2d at 1277, any relief granted against a federal employer in an ADEA civil suit must flow from, and be justified under, the "will effectuate the purposes" provision of subsection 633a(c). Palmer v. General Services Admin., 787 F.2d 300, 301 (8th Cir. 1986); cf. 29 U.S.C. § 626(b) (specifically providing for attorney's fees awards in private sector ADEA cases). We now hold that ADEA subsection 633a(c) may not be used to award attorney's fees against the federal government.

The magistrate's reliance on our decision in Smith to award fees in this case was erroneous, as Smith did not involve a claim of whether attorney's fees are recoverable against the government in an ADEA suit. Smith, 778 F.2d at 264. Confronted only with a dispute concerning the amount of attorney's fees awarded, we simply held in Smith that the district court did not err in calculating the amount of fees awarded to the plaintiff. Id. Unlike the government in Smith, defendants here raise a challenge to the propriety of awarding fees under the ADEA, and we -- after carefully considering this issue of first impression -- uphold their challenge.

In doing so, we adopt the rationale of the First Circuit's decision in Nowd v. Rubin, 76 F.3d 25, 27 (1st Cir. 1996), which found the language of ADEA subsection 633a(c) unable to overcome either the doctrine of sovereign immunity or the so-called American Rule of attorney's fees. Under the principle of sovereign immunity, the United States may not be sued except to the extent it consents by statute; any waiver of immunity must be *unequivocally expressed*, with all uncertainties being resolved in favor of the government. Nowd, 76 F.3 at 27 (citations omitted); see also Shanbaum v. United States, 32 F.3d 180, 182 (5th Cir. 1994) (citations omitted). Under the

14

"American Rule" of attorney's fees, absent *express* statutory authorization to the contrary (and a few nonapplicable exceptions), litigants are required to pay their own attorneys' fees. Nowd, 76 F.3d at 27 (citations omitted); see also Galveston Nav. Dist. v. Hopson Towing Co., 92 F.3d 353, 356 (5th Cir. 1996) (citing Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141(1975)).

Simply put, the generalized language of subsection 633a(c) -- authorizing "such legal or equitable relief as will effectuate the purposes of [the ADEA]" -- cannot be interpreted as an *express* authorization of fee-shifting on Congress' part, much less an *unequivocal* waiver of the government's sovereign immunity *vis a vis* awards of attorney's fees. Nowd, 76 F.3d at 27. Consequently, like the First Circuit, we find subsection 633a(c) "insufficient to overcome either the American Rule or sovereign immunity." Id. The magistrate abused his discretion in awarding Boehms attorney's fees under the ADEA.

We nonetheless remand the case to the magistrate to determine if Boehms may be awarded attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(b) (the "EAJA"). Nowd, 76 F.3d at 28. The EAJA provides, in pertinent part, that "[u]nless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in any civil action brought . . . against the United States . . . to the same extent that any other party would be liable under . . . the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b).

The First Circuit's identified two principal reasons to support its view that prevailing public sector ADEA plaintiffs may be awarded attorney's fees under the EAJA. Nowd, 76 F.3d at 28. First, noting that the ADEA specifically authorizes attorney's fees awards against private sector employers, see 29 U.S.C. § 626(b) (incorporating by reference the attorney's fees provision of the Fair Labor Standards Act, 29 U.S.C. § 216(b), into the private sector ADEA scheme), the court found it "entirely consistent with the EAJA's purpose that the United States, *qua* employer, assume responsibility on a completely equal footing with private sector employers in regard to attorney fee

awards under the ADEA." <u>Id</u>. (internal quotations and citations omitted); <u>see</u> EAJA § 2412(b) (permitting attorney's fees awards against the government "to the same extent that any other party would be liable under . . . the terms of any statute which specifically provides for such an award."). Further, "in keeping with the proviso to EAJA § 2412(b)," the court reasoned that ADEA § 633a(c) "cannot be said -- by its silence . . . -- to '*expressly* prohibit[]' attorney fee awards against the United States." <u>Nowd</u>, 76 F.3d at 27 (emphasis added). Finding the First Circuit's reasoning to be sound in this respect, we likewise conclude that the EAJA enables trial courts to award attorney's fees against the federal government in ADEA cases. We therefore remand this case to the magistrate for a determination of whether Boehms' attorney fee award may stand under the EAJA.

## CONCLUSION

Based on the foregoing reasons, we AFFIRM the finding that Boehms' nonselection to the position of Tupelo CSC manager was based on illegal age discrimination. Likewise, we AFFIRM the calculation of his back pay award. However, we REVERSE the award of attorney's fees under the ADEA, and REMAND for further proceedings to determine whether such award may stand under the EAJA.